# Richmond.

## GEORGE HARDYMAN v. COMMONWEALTH.

January 16, 1930.

Absent, Chichester and Epes, JJ.

The opinion states the case.

*R. C. Stokes, George A. Revercomb, Jr.,* and *R. B. Stephenson,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

· George Hardyman stands convicted of rape. He was fifteen and a half years old. Grace Martin, the prosecuting witness, was one month under fifteen years of age. The indictment charges use of force and violence in the accomplishment of his purpose. He was in due course tried, and sentenced to serve nine years in the State penitentiary.

Grace Martin had planned to live with her aunt, Mrs. Emma Martin, near Sweet Chalybeate Springs, that she might enjoy school facilities which her immediate home surroundings did not furnish. In furtherance of this purpose, she went on Sunday afternoon, September 23, 1928, to this aunt's home. Soon after her arrival, she took an automobile ride with two companions, Guy Looney and Lena McDowell, which ended at church. After church was over, she left that place of worship on foot. One Lewis Hilton in his car overtook her, and asked her if she did not wish to take a ride. She said that she did, and that she wished to go to Alleghany. Hilton picked her up and took her there, and to a house of a young woman named Mrs. Laura Sharpe. She reached the Sharpe home about ten o'clock that night, and after some delay was admitted. At that home on this occasion was a young man, Arden Matheny. On the following morning Matheny drove off in his automobile, and in a short time returned, bringing with him the accused, who was Mrs. Sharpe's half brother. He and the prosecutrix had known each other casually for some years. Soon

after Hardyman's coming, Mrs. Sharpe and Matheny drove off, leaving him and Grace alone in the home. Mrs. Sharpe returned during the day in time to prepare dinner, after which the accused left. All of this was on Monday. On Tuesday, Mrs. Sharpe took Grace to the White Sulphur Springs, and from there Grace went on to Oak Hill, and to her aunt, who is superintendent of a hospital in that town. On the same day, Tuesday, the accused went to Mrs. Emma Martin, with the knowledge of Grace, and to procure such clothes as she had left there. On that occasion he told Mrs. Martin that his name was Percy Anderson.

When Grace went to Mrs. Sharpe, it was in furtherance of a preconceived plan to leave school and go to her aunt's at Oak Hill. She made no statement to Mrs. Sharpe about the attack on her, and none to her mother until after she had taken her to a physician to be examined. She was examined, and the doctor found that her hymen had been recently ruptured by the passing of some blunt instrument into the canal. She did not deny having had intercourse, but declined to tell him with whom.

Her evidence of what occurred at or about the time of the alleged assault is: "He (the accused) asked me to do him a favor; I told him I didn't know what he meant, and he said I did know what he meant, * * *. I got up and went into the kitchen, and when I came back, he made it plainer, and I understood just what he meant;" and she went on to testify as follows:

"Q. What did you say to him when you understood what he meant?

"A. I told him no.

"Q. When you told him that, were you standing or sitting?

"A. I was standing.

"Q.   What did he do when you told him no?

"A.   He put his arms around me and forced me over to the bed.

"Q.   Did you try to get away from him?

"A.   Yes, sir.

"Q.   Nobody in the house then but you and George?

"A.   No, sir.

"Q.   Did you make any outcry?

"A.   No, sir; I didn't holler.

"Q.   You said he pushed you to the bed or dragged you?

"A.   He pushed me to the bed.

"Q.   Did you get on the bed yourself?

"A.   No, sir.

"Q.   What clothes did you have on then, Grace?

"A.   I had on the same clothes you showed a while ago.

"Q.   Those were your underclothes?

"A.   Yes, sir.

"Q.   What other clothes did you have on?

"A.   I had on this green dress I have on now.

"Q.   And after he had gotten you to the bed what did he do?  I know you don't like to tell.  Did he put his hands under your clothes?

"A.   Yes, sir.

"Q.   Did he get on you, Grace?

"A.   Yes, sir.

"Q.   Did he get his private part into your private part?

"A.   That was my first experience with that and I don't know whether he did, or not.

"Q.   While he had you on the bed there you say he got on you?  Did he get your knees separated?

"A.   Yes, sir.

"Q.   Did you feel something enter your person down there?

Objections.

"Q. Did you feel any pain, Grace, while he was on you?

"A. Yes, sir.

"Q. Did you bleed?

"A. Yes, sir.

"Q. Did you bleed from your private part?

"A. Yes, sir.

"Q. Have you any idea, Grace, how long he had you there holding you and doing what he was doing?

"A. No, sir; I don't.

"Q. And when you got up you found that you had bled, did you?

"A. Yes, sir.

"Q. You saw the clothes that your mother had in her hand today. These were those clothes you had on then?

"A. Yes, sir.

"Q. The clothes show some discoloration; what is that that is on those clothes?

Objection.

"Q. What is that, Grace, that discoloration on those clothes?

"A. I washed my clothes out first and that is what comes on them afterwards.

"Q. You washed them out?

"A. Yes, sir; I washed them the best I could.

"Q. Why did you wash them?

"A. Because they were all stained up and I didn't want to wear them.

"Q. You mean the blood stains were on them?

"A. Yes, sir.

"Q. How long, Grace, did George remain there at that house Monday after this?

"A. Until Laura came back.

"Q.   About what time did she come back?

"A.   About dinner time."

When asked why she did not tell Mrs. Sharpe what had occurred, she answered: "Because I knew Laura was his sister and I knew she would believe him and would not believe me."

She said that she did not tell her mother until after the medical examination because she was ashamed, and that she did not cry out at the time of the assault because she was excited and did not know what to do, and because she was "afraid to holler," and further said:

"Q.   Did you fight him with your hands?

"A.   Yes, sir; I done all I could.

"Q.   Did you fight him or scratch him, or anything of the sort?

"A.   I just twisted and tried to get away from him.

"Q.   Are you positive that was George Hardyman that made the attack on you?

"A.   Yes, sir.

"Q.   And that he stayed in that house until Laura and Arden came back?

"A.   Yes, sir."

The sheriff and the deputy went to arrest Hardyman, but failed to find him.   The deputy saw him going over a hill in the direction of a woods, but does not think that he was recognized.   The father promised to bring him later, and did so.

There was a preliminary hearing, at which the prosecutrix testified.   Her evidence there was taken down by a stenographer, and is, in part, as follows:

"A.   Yes, sir; and asked me to do him a favor, and I told him—and I asked him what kind of a favor he wanted me to do, and he said: 'You know,' and I told him I didn't, and he kept on, and finally I told him he

was a liar, I didn't know, and the next word he said I understood what he meant.

"Q. Do you know what those words were, do you remember what those words were?

"A. No, sir.

"Q. But he made it plain to you what he wanted to do?

"A. Yes, sir.

"Q. And then what took place?

"A. I told him no, and then I got up and went in the kitchen, and when I come back he was over there next to the bed and I told him I was going to cry, I knowed I was going to holler, and he told me I wasn't going to do that, and I told him I was, and he pushed me on the bed, so I knew wasn't any use to try to get away then, so I begged him to let me alone and he wouldn't do it."

\* \* \* \* \* \* \* \* \*

"A. I didn't exactly cry.

"Q. Well, what did you do?

"A. Well—

"Q. What?

"A. I didn't cry, but tears come up.

"Q. Were you mad with him?

"A. Yes, sir.

"Q. He stayed on there until late that afternoon, did he?

"A. Yes, sir.

"Q. Just you and he in the house together?

"A. Yes, sir.

"Q. You didn't go out anywhere?

"A. No, sir.

"Q. And he didn't?

"A. He went out but came back.

"Q. Had he left there when Laura and Arden Matheny came down?

"A. He had not left when Laura came.

"Q. Did she come by herself?

"A. Uh uh.

"Q. What time in the afternoon did she come?

"A. I just don't know.

"Q. Four or five o'clock?

"A. Oh, yes.

"Q. What were you and he doing from the time this occurred, which must have been around ten o'clock that morning, until the afternoon when she came?

"A. Just sitting around.

"Q. Just sitting around the house?

"A. Yes, sir."

This is not evidence given by the prosecutrix during the course of this trial, but is an account of the assault testified to by her on another occasion. Moreover, if we accept as true the first statement made, it does not materially change the situation. When she went into the kitchen, she knew that Hardyman wished to have intercourse with her, but there was nothing to suggest his intention to use force in the accomplishment of his purpose. Nor is the hour of Mrs. Sharpe's return of special importance. It is true, that she continued to sit around in the home, and made no complaint, but, as we have seen, her reason for this is understandable. She said that she knew that Mrs. Sharpe would believe Hardyman's account of what had occurred, rather than her own, for Mrs. Sharpe and Hardyman were sister and brother, and she knew it.

After all, it is to be remembered that Grace Martin was not yet fifteen years old, and her conduct must not be gauged by what might have been expected of a mature woman. The jurors and the trial judge saw

and heard her testify. Their verdict and judgment are not to be set aside if the evidence to sustain them can in reason be believed—a proposition stated and re-stated by this court on unnumbered occasions.

It could have been argued with force that we are dealing with a wayward girl, who had already determined to leave home, and that if she had intercourse at all about this time, it was a product of her own waywardness, for she made no complaint then or later until the situation was disclosed by a medical examination, when she was called upon to frame some sort of an excuse for her condition as uncovered by it, and that the tale she told was told in an effort to protect herself. This argument the jury doubtless heard and weighed. Their judgment upon it is not to be disturbed. Moreover, it had one weak link. Hardyman has said that he was not at the Sharpe home on the 24th. It is not likely that she would have selected out of her acquaintances one whom she did not see on that day at all, or afterwards. It is true that he, in support of an *alibi*, has produced many witnesses. If they are to be believed, he is not guilty. The jury did not believe them. Mrs. Sharpe has testified that she did not take Grace to the White Sulphur. There is evidence in rebuttal that she did, and there is also evidence in rebuttal showing that Hardyman was seen on the Sharpe steps on the morning of the assault.

█ Out of this maze of contradictions, it is not possible for this court to say with certainty what are the facts. Whenever there is a real conflict between witnesses whose accounts of the transaction are not inherently improbable, we must accept the judgment of the trial court when fortified by the jury's verdict. These are not unsupported by evidence, and so this assignment of error must be overruled.

Objection is next made to instructions given at the instance of the Commonwealth.

The court told the jury:

"(A). The court instructs the jury that if you believe from the evidence in this case beyond a reasonable doubt that Grace Martin, the prosecuting witness in this case, is under the age of sixteen years, and you further believe from the evidence beyond a reasonable doubt that the accused, George Hardyman, had sexual intercourse with her as charged in the indictment in this case, then the jury should find the accused guilty as charged in the indictment, and in the discretion of the jury punish him with death, or confinement in the penitentiary for life, or for any term not less than five years.

"(B). If the jury believe from the evidence beyond a reasonable doubt that Grace Martin on the 24th day of September last was under sixteen years of age, then they may disregard the words 'against her will by force,' used in the indictment; and may read and treat the indictment as if said words were not contained therein."

To these instructions this exception was taken: "Counsel for the defendant object to instructions A and B on the ground that the instructions do not show that the sexual intercourse was by force and against the will of the prosecutrix, and said instructions do not take into consideration the age of the prosecutrix, which is between fourteen and sixteen years, and that it is necessary to allege and prove force if same is relied upon by the Commonwealth."

Instructions ought to be read in connection with the evidence to which they apply. One in a certain state of facts might be misleading, although in another it could confuse no one. *Virginia Ry. & Power Co.* v. *Smith & Hicks*, 129 Va. 269, 105 S. E. 532; *McNamara* v. *Rainey Corp.*, 139 Va. 197, 123 S. E. 515.

During the course of this trial, the issue drifted down to a simple one of rape, as that term is commonly understood. When there is intercourse by violence, the age of the woman cannot affect the degree of the offense or the measure of punishment; that is the situation here. The indictment charges use of force, and force was used, if the crime was committed by the defendant. He does not claim that consent was given, but says that he was never present.

There was no occasion in instruction "A" to allude to the age of Grace Martin at all. Instruction "B" tells the jury that if she was under sixteen years of age, they may disregard the words "against her will by force" used in the indictment, and treat that charge as if they had not been written into it. In other words, the instruction said that if she was under sixteen years of age, and if George Hardyman had sexual intercourse with her, they should find him guilty and fix his punishment at death or confinement in the penitentiary for life, or for any term not less than five years. The statute provides (Code, section 4414) that when the female is between fourteen and sixteen years old, and consents, the punishment shall be from one to twenty years. This instruction, in certain circumstances, would have been highly prejudicial, but since consent was not claimed, and since force was charged and testified to, and since there is no suggestion that the offense was consummated by other means, this erroneous instruction could not, in any event, prejudice the defendant's case. Before prejudicial error in an instruction can be established, it must appear, not only that the instruction was itself wrong, but that the accused might suffer therefrom. If he is not injured, he cannot complain. One charged with, and convicted of, stealing a hundred dollars would not,

where the evidence supported the verdict, be heard to say that the jury was misdirected on the law of petit larceny. *Oliver* v. *Commonwealth*, 151 Va. 533, 145 S. E. 307.

■ It is further claimed that the court erred in refusing to give, at the defendant's instance, instructions 4, 5, 7, 10 and 11. In the bill of exceptions dealing with this phase of the case, objection is also made to the refusal of the court to give instruction 2, but that objection is not carried into this assignment of error. To this ruling of the court on the defendant's instructions, a blanket exception was taken, but no grounds therefor are assigned. Not having been stated they cannot be considered. *Keeney* v. *Commonwealth*, 147 Va. 678, 137 S. E. 478; *Hawse* v. *Bryan*, 148 Va. 194, 138 S. E. 721; *Myers* v. *Bibee Grocery Company*, 148 Va. 282, 138 S. E. 570; *Byrd* v. *Pennsylvania R. Co.*, 151 Va. 954, 145 S. E. 722; *City of Richmond* v. *Wright*, 151 Va. 966, 145 S. E. 732; Rule 22.

If we put this aside and consider these instructions on their merits, the situation is not changed.

■ This is rejected instruction number four: "The court instructs the jury that in order to constitute the offense of rape upon a girl under sixteen years of age the carnal knowledge of her must be either by force or with her consent; and in order to constitute rape by force, such force is a necessary ingredient of the crime, and that force must be such as may reasonably be supposed adequate to overcome the physical resistance of the woman upon whom the rape is charged to have been committed, taking into consideration the relative strength of the parties and other circumstances of the case, such as making outcries and giving alarm."

There is no particular objection which can be urged

against the statements of law written here, and if any question of consent were involved it would be highly important that the jury be properly instructed as to the measure of force necessary to distinguish between the crime accomplished with consent, and one brought about by force, but as we have seen there is no such issue. The prosecutrix's evidence, if it is to be believed, plainly shows that force was used, and in answer to that the defendant has presented an *alibi*.

"Where the evidence raises an issue as to consent, the court should properly charge the jury that force on the part of defendant and resistance on the part of the prosecutrix are essential to constitute the crime, and consent of prosecutrix, however reluctantly given, prevents the act being rape. * * *" 33 Cyc. 1505.

■ Of course, instructions should not be given merely because they embody a correct statement of the law. They must be based upon evidence, and apply to some issue in the case. *Norfolk & Portsmouth Belt Line R. Co.* v. *White*, 143 Va. 875, 129 S. E. 339; *Massie* v. *Parrish*, 140 Va. 717, 125 S. E. 691; *Henderson* v. *Foster*, 139 Va. 543, 124 S. E. 463.

■ Moreover, the indictment charges that the offense was consummated by the use of force, and the jury had already been told that it was necessary that they should believe beyond a reasonable doubt that Hardyman had sexual intercourse with the prosecutrix, as charged in the indictment, and that he was guilty of an attempt, even though he did not enter her person, if he "forced her on a bed and pulled up her clothes." The jury could not possibly have been misled into believing that the use of force was unnecessary.

■ This is rejected instruction number five: "The court instructs the jury that the punishment for the crime of rape by force and against her will upon a girl

under sixteen years of age is punishable by death or confinement in the penitentiary for life, or for any term not less than five years; for carnal knowledge of a girl between the ages of fourteen and sixteen years of age, with her consent, the punishment is by confinement in the penitentiary for not less than one year nor more than twenty years; for an attempt to commit carnal knowledge or sexual intercourse with a girl under sixteen years of age, with her consent, the punishment is by confinement in jail not less than six nor more than twelve months.''

The jury in instruction "A" had already been told what punishment was provided for by statute in rape by force. There is no evidence upon which further instructions need be based, and its rejection was proper.

Instructions 7 and 10 dealt with reasonable doubt. The court, in instructions 3 and 6, given at the instance of the defendant, had covered this subject, and it was neither necessary nor proper to continue to restate the law applicable thereto.

This is rejected instruction No. 11: "The court instructs the jury that it is the duty of the jurors to discuss the evidence in a spirit of fairness and candor in this case with each other, and with open minds to give careful consideration to the views of their fellows, and if it can be done without a sacrifice to conscientious conviction, agree upon a verdict, but the court further tells the jury that each individual juror is responsible for the verdict rendered and each individual juror must be satisfied beyond a reasonable doubt of the defendant's guilt before he can, under his oath, consent to a verdict of guilty, and each juror should realize that his own mind must be convinced beyond a reasonable doubt of the defendant's guilt before he can con-

sent to a verdict of guilty; therefore if any individual member of the jury after having duly considered all the evidence in this case and after consultation with his fellow jurors should entertain a reasonable doubt of the defendant's guilt, it is the duty of such juror not to surrender his own convictions and find a verdict of guilty simply because the balance of the jury believe that the defendant is guilty.

"The court further instructs the jury that a reasonable doubt may be raised either by a lack of evidence on the part of the Commonwealth or by the evidence introduced on behalf of the defendant, and it matters not how a reasonable doubt may arise, whether by lack of evidence on the part of the Commonwealth or by reason of the defendant's evidence, such doubt must be decided in favor of the defendant, and if the jurors or any of them have reasonable doubt of the defendant's guilt they cannot find a verdict of guilty in this case."

This instruction might have been properly given, but its rejection was not error, for notwithstanding the modifications introduced into it, as suggested in *Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382, it remains an invitation to disagree. *Nelson* v. *Commonwealth, ante,* page 909, 150 S. E. 407 (decided November 14, 1929.)

We find no reversible error in the action of the court in giving and refusing instructions.

Some confusion of thought came into the case because of the tender years of the prosecutrix, but, as has been seen, if the crime has been committed at all, it was committed through force and violence. In such circumstances, her age, as a matter of law, became unimportant.

Remarks made by counsel for the Com-

monwealth during the course of argument are the subject of the next assignment, particularly this: "I say to you it is on trial before you this question. Can reliable, trustworthy, truthful witnesses come into court and convict a criminal by reliable, trustworthy, evidence, or can criminals, if they have enough friends of the same stripe, be brought together and come in and make a raid on the courthouse."

The liberties to which counsel are entitled in argument and the limitations thereon have been so recently and satisfactorily discussed by Mr. Justice Campbell, in *N. & W. Ry. Co.* v. *Eley*, 152 Va. 773, 148 S. E. 678, as to make a restatement of the governing principles at this time unnecessary. Its character is measurably governed by the character of the evidence. Rarely has a case come before us so filled with wholly irreconcilable testimony. Certainly all of the witnesses cannot be telling the truth and it is equally certain that some of them knew at the time that they were not telling it. Comment upon this and upon conclusions which must inevitably follow was well within bounds, and it is to be expected that each lawyer would seek to impress upon the jury, wholly in good faith, the trustworthiness of his own witnesses and their standing in the communities in which they live, and for the same reason comparisons in this particular might have been expected. Mrs. Sharpe and her interest in this case appears to have been the subject of considerable discussion and sundry exceptions are taken as to what was said about this. From the evidence it appeared that she was living by herself at Alleghany. When Grace reached her home at ten o'clock on Sunday night, young Arden Matheny was there. She was half-sister to the accused, and naturally interested in doing all possible to protect him. Moreover, there is evidence tending to show that

Grace's visit on that occasion was not a matter of chance and that she had talked with her about leaving home on more than one occasion. Her statement is that she left her own home Monday morning and did not see Grace afterwards, while the Commonwealth produced a witness who testified to having seen her drive with Grace Tuesday morning in the direction of White Sulphur. This was, of course, before the jury, and it is not unreasonable to argue that her interest was reflected in her associate, Arden Matheny, and the development of this idea for the purpose of showing bias was proper. Sundry exceptions were taken to evidence which brought out these facts, but we are of opinion that they are without merit.

The court refused to permit J. J. Matheny, father of Arden, to testify in sur-rebuttal as to the whereabouts of Mrs. Matheny on Tuesday. This witness had already testified and had touched upon that subject. The court was justified in not permitting him to go over it again.

Mrs. Martin, mother of the prosecutrix, was asked if the defendant's witnesses were friends or associates of the prosecutrix or her family. She answered that they were not and that she did not permit her daughter to associate with them. It was competent to show the relationship of the parties. 10 Ency. of Ev., page 597. It is not important and plainly is not reversible error.

Exception is next taken to the fact that argument for the defendant was limited to a two-hour period. It was far more than enough.

The last assignment of error is based upon the refusal of the court to admit the defendant to bail, pending his application for a writ of error. It cannot

be claimed that this is reversible error, and it is not necessary here to enter into any discussion of that subject.

Sundry other exceptions not here discussed are taken to the action of the trial court in the admission and exclusion of evidence. They deal with matters which, in the main, in our judgment are unimportant, and we content ourselves with saying that no reversible error was at any time committed in these particulars. It is perfectly true that the testimony tending to establish an *alibi* is strong, but it is manifest that it was not credited by the jury and so we are thrown back upon that introduced on behalf of the Commonwealth, which, if true, is plainly sufficient to support the verdict. The jury thought it was true, and in this are sustained by the judgment of the trial judge. It is here that this case turns—here and upon the instructions. These are matters worthy of the serious consideration which we have given to this case. Other matters urged are relatively unimportant. On none of them could a judgment of reversal be based.

We find no error in the record, and the judgment is affirmed.

*Affirmed.*