# Lem Davis Tuggle, Jr.

## v.

# Commonwealth of Virginia

Record No. 840486.

November 30, 1984.

Present: All the Justices.

*Joseph S. Tate; John H. Tate, Jr. (Gwyn, Tate & Tate*, on brief), for appellant.

*Todd E. LePage, Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

In a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, Lem Davis Tuggle, Jr., was convicted of capital murder for the willful, deliberate, and premeditated murder of Jessie Geneva Havens during the commission of, or subsequent to, rape, Code § 18.2-31(e), and his punishment was fixed at death. Following a sentencing hearing, the trial court confirmed the jury's verdict and sentenced Tuggle to death. The automatic review of Tuggle's death sentence and his appeal from his conviction have been consolidated, Code § 17-110.1 and given priority on our docket, Code § 17-110.2.[1]

The facts relating to Tuggle's guilt are uncontroverted; the defendant presented no evidence during this phase of the trial. On Saturday night, May 28, 1983, Tuggle attended a dance at the American Legion lodge in Marion, and upon his arrival, he asked if he could "check" a gun. He was advised that he could not. Tuggle was told that he should lock the gun in the trunk of his car. He left the building briefly, and when he returned, said, "That's taken care of."

The victim, Jessie Geneva Havens, and two friends also were at the dance. The defendant introduced himself. to them as David Tuggle. He sat at a table with the three women and danced with them throughout the evening.

When the dance ended at 1:00 a.m. Sunday, Havens' two friends left together and she left with Tuggle. The defendant had agreed to drive Havens to her home; she had advised him that she had to go directly home because her granddaughters were staying with her. As her two friends were leaving the parking lot, they observed that Havens was standing next to the passenger side of the defendant's automobile, and Tuggle was opening the trunk. Havens was wearing blue jeans, a blue and white striped blouse, and moccasin-type shoes.

Shortly thereafter, State Trooper G. N. Smith stopped the defendant's automobile because it was weaving on the highway near Seven Mile Ford in Smyth County. Tuggle was driving, and the

---

[1] The Attorney General filed a motion to dismiss this appeal on the ground that Tuggle, along with five other inmates of Mecklenburg Correctional Center, had escaped from lawful custody on May 31, 1984, and his escape "disentitles him to call upon the resources of this Court for determination of his claim." The record indicates that Tuggle was subsequently recaptured and has been returned to custody. For the reasons stated in *Jones* v. *Commonwealth*, 228 Va. 427, 435, 323 S.E.2d 554, 558 (1984), this day decided, we deny the motion.

trooper observed a large, middle-aged, white female sitting in the front seat of the automobile "right next to the driver." The woman was wearing jeans and a blue, green, or aqua blouse. After the trooper determined that the defendant was not intoxicated, Tuggle drove away in the direction of Hubble Hill Road. Havens never returned home, and at six o'clock that evening, the police were notified that she was missing.

In the early morning of June 2, 1983, State Trooper R. M. Freeman was dispatched to an area on Interstate Highway 81 in Pulaski County to look for a black pickup truck equipped with a camper. Shortly after his arrival, Freeman stopped a truck meeting that description and recognized Tuggle as the driver. When the trooper asked the defendant if he had been near the Riverside Exxon Station, Tuggle responded: "Yes, I robbed it, the money's in my pocket, the gun's in the truck."

Thereupon, Freeman took possession of a .25 caliber automatic weapon. (Ballistics tests established that this gun fired the bullet which killed Havens.) While Freeman was taking Tuggle to the Pulaski County Sheriff's Office, Tuggle volunteered that he was connected with a missing person's report relating to Jessie Havens and said that he would have a "long talk" with Smyth County authorities later.

Later that morning, a Smyth County Sheriff's Office investigator interviewed Tuggle concerning Havens' disappearance. The officer advised Tuggle of his *Miranda* rights. Tuggle waived these rights and told the officer that he could find Jessie Havens over a bank at a certain spot on Hubble Hill Road near Seven Mile Ford. When the officer asked the defendant what had happened to Havens, Tuggle responded: "I don't know but she's there." The defendant then told the officer that he did not want to discuss the matter further until he had spoken to an attorney. He specifically stated: "From past experience, I would like to talk to an attorney. I'll probably tell you the full story later."

Approximately 9:30 a.m. on June 2, the investigator went to the place where Tuggle said Havens would be found. He found Havens' body at the site. Havens was clad in jeans "down around her knees," a blue and white striped blouse "pulled up to about the armpits," and "black silk panties . . . rolled down somewhat." A portion of the victim's pantyhose was "sticking out of the top" of her jeans, and one of her legs was out of the pantyhose.

An autopsy revealed that the victim's body had an abrasion and a bruise on the left frontal area of the forehead, a small abrasion on the right frontal area of the forehead, an abrasion on the neck, a bite mark on the lower, inner quadrant of the right breast, a number of small bruises on the upper, inner aspect of the right arm, and a bruise on the right thumb and right wrist. Havens also had sustained a large bruise on the upper, inner thigh, bruises on the vaginal vault at the posterior aspect and near the bottom, and a gunshot wound in the chest.

According to the medical examiner, "the bruises of the vagina indicate penetration of the vaginal vault by something, a penis, a finger, an object, something." The medical examiner testified that both the bite mark on the breast and the bruising around the vagina occurred while Havens was alive. He also testified that no semen or spermatozoa was found in Havens' vagina, but that semen was found in the rectum, indicating "penetration and ejaculation into the rectum."

A forensic odontologist testified that he examined the bite mark on the victim's right breast. He compared the mark with models of Tuggle's teeth and concluded "with all medical certainty these marks on the body of Ms. Havens were made by the teeth of Mr. Tuggle." He further opined that Havens was alive and moving when she was bitten.

## I. PRETRIAL PROCEEDINGS.

### A. *Request for a Second Psychiatric Evaluation.*

On Tuggle's motion, the trial court ordered an evaluation of the defendant to determine his sanity at the time of the offense and his competency to stand trial. Code §§ 19.2-169.1 and -169.5. The Commonwealth neither concurred in nor opposed the motion. Pursuant to the order, Tuggle was admitted to Central State Hospital. Following his evaluation, the hospital reported that he was sane at the time of the offense and competent to stand trial.

Fourteen days before his trial was to commence, Tuggle sought another psychiatric evaluation at his expense by a Charlottesville psychiatrist. The court denied the motion, observing that Tuggle previously had been evaluated at his own request, the trial date was close at hand, and if the motion were granted, Tuggle would have to be transported under guard from the Marion jail to Charlottesville in one day, leaving "just a few hours for an evaluation."

Tuggle argues on appeal that the court's denial of his motion precluded him from "bringing to the attention of the jury the mitigating circumstances only ascertainable through a psychiatric examination by a neutral professional." Relying upon *Barefoot* v. *Estelle*, 463 U.S. 880 (1983), he contends that a second evaluation was necessary in an attempt to refute a psychiatric opinion that Tuggle presented future dangerousness.

We note at the outset that this reason (i.e., refuting future dangerousness) was not advanced in either Tuggle's written motion or his oral argument on the motion in the trial court. *See* Rule 5:21. Aside from that, however, we find no merit to this contention. We believe the issue of whether the defendant should receive a second psychiatric evaluation under the circumstances of the present case was a matter resting within the sound discretion of the trial court, and we cannot say the court abused its discretion.

Moreover, Tuggle's reliance upon *Barefoot* is misplaced. Unlike the facts in *Barefoot*, Tuggle, as we previously noted, requested and received the first psychiatric evaluation. *Barefoot* does not suggest that a defendant who has been examined at his own request has a constitutional right to further evaluations. Further, the suggestion that a second evaluation would have produced a different result is speculative at best.

### B. *Change of Venue and Sequestration of the Jury.*

Tuggle contends the trial court abused its discretion by refusing to change the venue of his trial. He asserts that a change of venue was required due to extensive pretrial publicity concerning his case and because eight veniremen were excused for having formed an opinion concerning his guilt or innocence.

The law presumes that an accused can receive a fair trial from the citizens of the jurisdiction where the offense occurred. A defendant has the burden of overcoming this presumption by clearly showing that widespread prejudice among the citizenry would make a fair and impartial trial impossible. *Stockton* v. *Commonwealth*, 227 Va. 124, 137-38, 314 S.E.2d 371, 379-80, *cert. denied*, 105 S.Ct. 229-30 (1984). Extensive publicity alone is insufficient to justify a change of venue. *Id.* Finally, change of venue is addressed to the sound discretion of the trial court, and refusal does not constitute reversible error unless the record affirmatively shows an abuse of discretion. *Id.*

■ Tuggle presented only ten newspaper articles, all factual in nature, and it took only 28 prospective jurors to secure a panel of 20. Nothing in the record suggests that there was widespread prejudice against Tuggle in Smyth County, and we readily conclude that the court did not abuse its discretion in denying a change of venue.

■ Again relying upon pretrial media publicity, Tuggle claims the trial court should have sequestered the jury. This, too, is a matter of broad discretion. *Stockton*, 227 Va. at 138, 314 S.E.2d at 380. *See also Jones* v. *Commonwealth*, 228 Va. 427, 442-43, 323 S.E.2d 554, 562 (1984), this day decided. The trial court painstakingly admonished the jury not to discuss the case with others or to expose themselves to media coverage of the trial, and nothing in the record suggests that any juror disregarded this direction. Consequently, we hold that the court did not abuse its discretion in refusing to sequester the jury.

## C. *Jury Voir Dire.*

■ Tuggle contends the court committed a number of errors by limiting his voir dire of prospective jurors.[2] He first contends that the court erred in denying his motion to examine each prospective juror out of the presence of the others. He argues that the 1981 amendment to Code § 8.01-358[3] gives him that right. We do not agree.

Prior to the 1981 amendment, permitting counsel-conducted voir dire was discretionary with the trial court. *Turner* v. *Commonwealth*, 221 Va. 513, 521, 273 S.E.2d 36, 41-42 (1980), *cert. denied*, 451 U.S. 1011 (1981). As amended, § 8.01-358 gives counsel "the right to examine under oath any person who is called as a juror [and] the right to ask such person or juror directly any relevant question" respecting the four criteria set forth therein. Contrary to Tuggle's contention, however, the amendment does

---

[2] One contention is that the trial court erred in refusing to permit Tuggle to question the venire as to whether they had a bias in favor of the death penalty. However, because error was not assigned to this ruling, we will not consider it on appeal. Rule 5:21.

[3] Code § 8.01-358 reads in pertinent part as follows:

The court and counsel for either party shall have the right to examine under oath any person who is called as a juror therein and shall have the right to ask such person or juror directly any relevant question to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein . . . .

not give counsel the right to examine each venireman out of the presence of the others. Whether this procedure is employed remains a matter within the trial court's discretion, and we cannot say that the court abused its discretion in denying Tuggle's motion.

■■■■■ Tuggle also claims that the court erred by refusing to permit him to question certain veniremen concerning their service as jurors in another, unrelated criminal case. The record suggests that these veniremen had been asked by a newspaper reporter and a sheriff's employee to explain how they arrived at their verdict in the previous case. When Tuggle attempted to question these prospective jurors about the matter, the court, sustaining the Commonwealth's objection, stated, "[t]hat's another matter. You may quiz them on this particular case." Tuggle made no proffer for the record of precisely what he sought to develop. *See Wyche* v. *Commonwealth*, 218 Va. 839, 842-43, 241 S.E.2d 772, 774-75 (1978); *Whittaker* v. *Commonwealth*, 217 Va. 966, 968-69, 234 S.E.2d 79, 81 (1977).

Counsel's voir dire questions must be relevant, and the trial court's ruling on relevancy will not be disturbed on appeal unless an abuse of discretion is apparent. *LeVasseur* v. *Commonwealth*, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), *cert. denied*, 464 U.S. 1063 (1984). "The test of relevancy is whether the questions relate to any of the four criteria set forth in [Code § 8.01-358]." *Id.* Because no proffer was made, we have no means of determining the relevancy of the inquiry, and we cannot say the court's ruling was an abuse of discretion.

■■■■ Tuggle's final voir dire contention relates to the court's refusal to permit him to challenge veniremen for cause out of the panel's presence. When the voir dire apparently had concluded, the court *sua sponte* ruled that the panel was qualified. Tuggle requested permission to make challenges for cause out of the presence of the panel. The court reiterated that the panel was qualified on the basis of the voir dire, but added that counsel, if he desired, could question the venire further. Counsel responded that he had no further questions, and the court advised him to proceed with his peremptory strikes. This he did. Counsel, however, did not proffer for the record which veniremen would be challenged or the basis therefor.

Unquestionably, in this as well as in all other cases, counsel should be afforded the opportunity to challenge jurors for cause

out of the presence of the panel. However, from the record before us, we cannot say the trial court's ruling constituted reversible error. The record indicates that the court was careful to ascertain that each member of the panel was disinterested, had not expressed or formed any opinion respecting Tuggle's guilt or innocence, was not sensible of any bias or prejudice, and stood indifferent in the cause. Hence, the trial court implicitly ruled that none of the jurors was susceptible to challenge for cause. Furthermore, because no proffer was made for the record, there is nothing to suggest that the defendant was prejudiced by the court's ruling.

## II. THE GUILT TRIAL.

### A. *Testimony of Another Crime.*

Because the police were looking for a black pickup truck equipped with a camper, State Trooper Freeman stopped Tuggle on Interstate Highway 81 in Pulaski County. Over Tuggle's objection, Freeman was permitted to testify that when he asked if Tuggle had been near the Riverside Exxon Station, the defendant responded: "Yes, I robbed it, the money's in my pocket, the gun's in the truck." Freeman then seized the gun, and ballistics tests proved that the gun fired the bullet that killed Havens.

The defendant contends that Freeman's testimony of Tuggle's statement respecting the commission of another crime was irrelevant and prejudicial. The Commonwealth argues, however, that the statement was connected with the capital murder charge and its probative value greatly outweighed any incidential prejudice to Tuggle.

As a general rule, proof of other crimes is incompetent and inadmissible to show commission of the crime charged. There are, however, well-established exceptions to the rule. Evidence of other crimes is permitted "if it tends to prove any relevant element of the offense charged. . . . or where the evidence is connected with or leads up to the offense for which the accused is on trial." *Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). *See also Scott* v. *Commonwealth*, 228 Va. 519, 527, 323 S.E.2d 572, 577 (1984), this day decided. Even if the other crime falls within an exception to the general rule, it only is admissible "[w]henever the legitimate probative value outweighs the incidental prejudice to the accused." *Lewis* v. *Commonwealth*, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983).

■ Here, Tuggle's voluntary exclamation established his possession of the murder weapon. Therefore, this evidence was connected with the charge for which Tuggle was on trial. Seizure of the weapon from Tuggle's possession and the scientific evidence derived therefrom were most important in the truth-finding process. Because the probative value of the testimony greatly outweighed any prejudicial effect, we hold that the trial court did not err in admitting it. *See Stockton*, 227 Va. at 143, 314 S.E.2d at 383.

## B. *Jury Instructions.*

■ Next, we consider Tuggle's assignments of error relating to the granting and denial of certain jury instructions. Instruction 2[4] which was granted, and Instruction A,[5] which was refused, both dealt with the presumption of innocence. Similarly, Instruction 11,[6] which was given, and Instruction I,[7] which was denied, both dealt with motive. Although Tuggle concedes that all these

---

[4] Instruction 2 reads as follows:

The defendant is presumed to be innocent. You should not assume the defendant is guilty because he has been indicted and is on trial. This presumption of innocence remains with the defendant throughout the trial and is enough to require you to find the defendant not guilty unless and until the Commonwealth proves each and every element of the offense beyond a reasonable doubt. This does not require proof beyond all possible doubt, nor is the Commonwealth required to disprove every conceivable circumstance of innocence. However, suspicion or probability of guilt is not enough for a conviction.

There is no burden on the defendant to produce any evidence.

A reasonable doubt is a doubt based on your sound judgment after a full and impartial consideration of all the evidence in the case.

[5] Instruction A reads as follows:

The defendant is presumed to be innocent. This presumption of innocence goes with him through the entire case and applies at every stage thereof and is sufficient to require you to find the defendant not guilty unless and until the Commonwealth upon whom the burden rests, proves his guilt beyond a reasonable doubt, and the Court further tells you that it is not sufficient that the facts and circumstances prove to be consistent with the guilt of the defendant, but they must be inconsistent with every reasonable hypothesis consistent with the innocence of the defendant.

[6] Instruction 11 reads as follows:

To prove the charge of murder the Commonwealth does not have to prove a motive for the killing. The presence or absence of a motive may be considered in arriving at your verdict.

[7] Instruction I reads as follows:

The Court instructs the jury that while a motive is not an essential element of the crime of murder, the lack of evidence of a motive is an element for you to consider

instructions accurately stated the law, he contends, nevertheless, that the instructions he tendered were preferable.

When a granted instruction accurately states a principle of law, the trial court does not abuse its discretion by refusing another instruction involving the same legal principle. *Stockton*, 227 Va. at 145, 314 S.E.2d at 384; *Lincoln v. Commonwealth*, 217 Va. 370, 375, 228 S.E.2d 688, 691-92 (1976); *Asbury v. Commonwealth*, 211 Va. 101, 107, 175 S.E.2d 239, 243 (1970). Moreover, when one instruction correctly states the law, multiple instructions upon the same legal principle are undesirable. *Ambrose v. Commonwealth*, 129 Va. 763, 766, 106 S.E. 348, 349 (1921). We conclude, therefore, that the trial court did not err in granting Instructions 2 and 11 and in refusing Instructions A and I.

Tuggle further contends that the court erred in refusing to instruct the jury on voluntary manslaughter. Although Tuggle presented no evidence in the guilt phase of his trial, he argues that the Commonwealth's evidence suggests that he and the victim were involved in "a friendly social setting" and the jury reasonably could have inferred that Havens' death resulted from "a quarrel in the heat of passion during a consensual sexual act."

We do not believe such an inference can be fairly deduced from the evidence. To the contrary, the evidence clearly established that Havens was the victim of a vicious sexual assault culminating in death from a gunshot. Because the evidence did not support the giving of an instruction on voluntary manslaughter, we reject this contention. *See Bunch v. Commonwealth*, 225 Va. 423, 440-41, 304 S.E.2d 271, 281, *cert. denied*, 464 U.S. 977 (1983); *Wooden v. Commonwealth*, 208 Va. 629, 634-35, 159 S.E.2d 623, 627 (1968).

We are also of opinion that the trial court properly refused Instruction N tendered by Tuggle.[8] This instruction would have told the jury that if they differed, they were not required to sur-

---

on the issue of intent since the evidence of the Commonwealth in this case is circumstantial.

[8] Instruction N reads as follows:

You are instructed that if, after careful, honest, and impartial consideration of these instructions and all the evidence admitted in the case, any of your members should honestly and conscientiously differ on the weight and effect to be given the evidence and the verdict to be rendered, then you may disagree. In other words, you are not required to surrender your honest convictions concerning the effect of the evidence or the verdict to be rendered, for the mere purpose of agreeing on a verdict.

render their convictions merely to render a verdict. This is an invitation for jurors to disagree, and we previously have condemned similar instructions. *See Randolph* v. *Commonwealth,* 190 Va. 256, 266, 56 S.E.2d 226, 231 (1949); *Ferrell* v. *Commonwealth,* 177 Va. 861, 873, 14 S.E.2d 293, 297 (1941); *Hardyman* v. *Commonwealth,* 153 Va. 954, 969-70, 151 S.E. 286, 292 (1930); *Nelson* v. *Commonwealth,* 153 Va. 909, 926-27, 150 S.E. 407, 412 (1929).

Finally, we find the trial court did not err in giving Instructions 5[9] and 7.[10] Instruction 5 is an accurate statement of the law, and, for reasons stated in part II, subsection C, of this opinion, we find that there was evidence to support granting it. We also conclude that Instruction 7 accurately defined sexual intercourse.

## C. *Sufficiency of the Evidence.*

To convict Tuggle of capital murder, the Commonwealth must prove beyond a reasonable doubt that he willfully, deliberately, and with premeditation murdered Havens during the commission of, or subsequent to, rape. Code § 18.2-31(e). Conceding that the evidence is sufficient to prove he killed the victim, the defendant contends, nevertheless, that for two reasons it is insufficient to prove the essential element of rape. First, he argues that the Commonwealth's evidence fails to establish that he penetrated the victim's vagina with his penis. Second, he asserts that the evidence fails to show that he forced the victim to have sexual intercourse against her will.

---

[9] Instruction 5 reads as follows:

The element of force required must be sufficient to overcome any unwillingness on the part of Jessie Geneva Havens to have sexual intercourse. There must be a show of force sufficient to overcome resistance. She must resist by every means within her power under all the circumstances then existing. However, she is not required to resist if she reasonably believes that resistance would be useless and would result in serious bodily injury to her.

You may consider whether or not any weapons were used, the time, the place, the number of persons involved, their relative physical size and strength and all of the circumstances disclosed by the evidence.

[10] Instruction 7 reads as follows:

Sexual intercourse means an actual penetration, no matter how slight, of the defendant's penis into the sexual organ of Jessie Geneva Havens. It is not necessary that there be an ejaculation by the male.

To prove rape, the evidence must establish beyond a reasonable doubt that an accused has had sexual intercourse with a female by force and against her will. *Dusenbery* v. *Commonwealth*, 220 Va. 770, 772, 263 S.E.2d 392, 394 (1980); *Strawderman* v. *Commonwealth*, 200 Va. 855, 858, 108 S.E.2d 376, 379 (1959); *Bradley* v. *Commonwealth*, 196 Va. 1126, 1135, 86 S.E.2d 828, 833 (1955). To establish that sexual intercourse occurred, the Commonwealth "must prove that there has been an actual penetration to some extent of the male sexual organ into the female sexual organ." *McCall* v. *Commonwealth*, 192 Va. 422, 426, 65 S.E.2d 540, 542 (1951). Penetration need only be slight, however, *Rowland* v. *Commonwealth*, 147 Va. 636, 639, 136 S.E. 564, 565 (1927), and ejaculation is not necessary to prove penetration, *State* v. *Worthy*, 239 S.C. 449, 462, 123 S.E.2d 835, 842 (1962).

Rape, like all other crimes, may be proved by circumstantial evidence. *Strawderman*, 200 Va. at 859, 108 S.E.2d at 379; *McCall*, 192 Va. at 426, 65 S.E.2d at 542. When the Commonwealth relies solely upon circumstantial evidence, however, it is not sufficient that the facts and circumstances proven are consistent with an accused's guilt; they also must be inconsistent with every reasonable hypothesis of his innocence. *Strawderman*, 200 Va. at 859, 108 S.E.2d at 379; *McCall*, 192 Va. at 427, 65 S.E.2d at 542.

Finally, when the sufficiency of the evidence is challenged on appeal, the evidence and all reasonable inferences fairly drawn therefrom must be viewed in the light most favorable to the Commonwealth. The trial court's judgment should be affirmed unless it appears that it is plainly wrong or without evidence to support it. *Stockton*, 227 Va. at 145-46, 314 S.E.2d at 385.

In the present case, the undisputed evidence established that when the victim's body was discovered, her blouse was pulled up around her armpits, her jeans were down around her knees, and her panties were "rolled down somewhat." A portion of her pantyhose was "sticking out of the top" of her jeans and one of her legs was out of the pantyhose. She had sustained numerous abrasions and contusions, a bite on the lower inner quadrant of her right breast, and a gunshot wound in her chest, which caused her death.

Moreover, Havens sustained contusions at the posterior aspect of her vaginal vault. The medical examiner testified that these

vaginal bruises occurred while the victim was still alive and "something" had penetrated the vagina. Tests established that semen was found in the victim's rectum, indicating penetration and ejaculation there, but sperm was not found in her vagina.

Relying upon *McCall* and *Strawderman*, Tuggle asserts that this evidence failed to prove sexual intercourse. Both cases involved alleged rapes of young children. Although the victim in each case sustained vaginal injuries, there was no evidence in either case that the defendant had exposed his penis to the victim. Moreover, there was no evidence that either of the victim's underclothing had been removed or disarranged or that semen or sperm was found on them or their clothing. *Strawderman*, 200 Va. at 857, 108 S.E.2d at 378; *McCall*, 192 Va. at 426, 65 S.E.2d at 542.

In contrast, here Havens' clothing was disarranged and sperm was discoverd in her rectum, clearly indicating that Tuggle had exposed his penis. More importantly, the uncontroverted medical evidence established that the victim's vagina had been penetrated.

Tuggle argues, however, that this evidence fails to exclude every reasonable hypothesis consistent with his innocence. He suggests that the injuries to the victim's vaginal area could have "resulted from manipulation during anal intercourse." We do not agree.

The present case is quite similar to *Nilsson* v. *State*, 477 S.W.2d 592 (Tex. Crim. App. 1972). In *Nilsson*, medical experts testified that the victim's vagina had been penetrated, but there was no direct evidence that penetration was with a penis. *Id.* at 595. Nilsson, like Tuggle, contended that the prosecution's evidence failed to exclude the hypothesis that an object other than the defendant's penis penetrated the vagina. Rejecting this contention, the Texas court said that such a hypothesis must be substantiated by other evidence in the case. *Id.* at 597. Because it was not, the court concluded that there was no reasonable outstanding hypothesis that the vagina was penetrated by an object other than the defendant's penis. *Id.*

Similarly, no evidence in the present case reasonably suggests penetration of the victim's vagina by an object other than the defendant's penis. While the Commonwealth's evidence must exclude all reasonable hypotheses of innocence, the hypotheses "which must be thus excluded are those which flow from the evidence itself, and not from the imaginations of defense counsel." *Cook* v. *Commonwealth*, 226 Va. 427, 433, 309 S.E.2d 325, 329

(1983). *See also Turner* v. *Commonwealth*, 218 Va. 141, 148-49, 235 S.E.2d 357, 361 (1977). Therefore, when the evidence and all reasonable inferences fairly deduced therefrom are viewed in the light most favorable to the Commonwealth, we hold that the jury reasonably could have found that the defendant's penis penetrated the victim's vagina.

Tuggle further asserts that the Commonwealth's evidence is insufficient to establish that he forced the victim to have sexual intercourse against her will. No useful purpose will be served by again reciting all the shocking facts surrounding this tragedy. Suffice it to say, Havens was subjected to a most brutal and heinous sexual assault. The extensive bruises on the victim's body, the vicious bite on her breast, the forcible anal sodomy, and the fatal gunshot wound all attest to that.

Obviously, forcible sexual intercourse is more easily established when the victim is able to testify, or when the accused confesses, but the absence of such evidence does not necessarily preclude a finding of force. The elements essential to establish rape may be based upon the totality of the facts and circumstances. *Keil* v. *Commonwealth*, 222 Va. 99, 105, 278 S.E.2d 826, 830 (1981); *Justus* v. *Commonwealth*, 220 Va. 971, 979-80, 266 S.E.2d 87, 93 (1980), *cert. denied*, 455 U.S. 983 (1982). Considering all the facts and circumstances presented and viewing the evidence and all reasonable inferences fairly deduced therefrom in the light most favorable to the Commonwealth, we conclude that the evidence supports the jury's finding of forcible sexual intercourse.

Therefore, we reject Tuggle's contention that the evidence was insufficient to prove capital murder. We cannot say that the court's judgment sustaining the jury's finding of rape is plainly wrong or without evidence to support it.

### D. *Other Matters.*

Four times during the first day of trial, the court declared a brief recess because one of the jurors was ill. Tuggle moved for a mistrial because of the juror's illness. The court denied the motion, finding the juror able to discharge his duty. The record does not disclose the nature of the juror's illness, and there is no suggestion that he was unable to perform his duty.

Whether a juror is capable of discharging his duty is a matter within the sound discretion of the trial court, and its finding will

not be disturbed on appeal absent a clear abuse of discretion. *See Ellis* v. *Commonwealth*, 227 Va. 419, 422, 317 S.E.2d 479, 481 (1984). We find the court did not abuse its discretion.

Finally, the record does not support Tuggle's assignment of error relating to the trial court's refusal to declare a mistrial based on the Commonwealth's Attorney's conduct. The granting or denial of a mistrial is a matter resting within the court's discretion. We find no abuse of discretion.

## III. THE PENALTY TRIAL.

### A. *Admissibility of Psychologist's Opinion of Tuggle's Future Dangerousness.*

In the penalty trial, Dr. Arthur Center, a clinical psychologist who evaluated Tuggle at Central State Hospital, was allowed to opine that Tuggle "shows a high probability of future dangerousness." The defendant unsuccessfully objected to this testimony on the ground that he was examined without the benefit of counsel.

Tuggle asserts that because an attorney had been appointed to represent him at the time of his examination, his Sixth Amendment right was violated when he was examined without the benefit of counsel. In support of his argument, Tuggle relies upon *Estelle* v. *Smith*, 451 U.S. 454 (1981).

In *Estelle* v. *Smith*, the trial court "informally ordered" the State's attorney to arrange a psychiatric examination of Smith to determine Smith's competency to stand trial. *Id.* at 456-57. The evaluation was ordered even though Smith's attorney had not requested it, and the record suggests that Smith's counsel was unaware that the examination had been ordered. *Id.* at 458, note 5. Without obtaining a waiver of rights by Smith or permission from Smith's counsel, the psychiatrist examined Smith and concluded that he would be a danger to society in the future. *Id.* at 458-59. Over Smith's objection, the psychiatrist testified in the penalty phase of the trial as to Smith's future dangerousness. *Id.* at 459-60.

The Supreme Court held that Smith's Sixth Amendment right to counsel was violated when the psychiatrist was allowed to testify regarding future dangerousness. The Court expressly noted that its holding does not preclude an accused from waiving this constitutional right. *Id.* at 471, note 16. Smith, however, did not waive this right.

The right to counsel may be waived provided the waiver is made voluntarily, knowingly, and intelligently. *Edwards* v. *Arizona*, 451 U.S. 477, 482 (1981); *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938); *Johnson* v. *Commonwealth*, 220 Va. 146, 157-58, 255 S.E.2d 525, 531 (1979); *Lamb* v. *Commonwealth*, 217 Va. 307, 310-11, 227 S.E.2d 737, 740 (1976). Whether a waiver is effective depends upon the facts and circumstances of each case, including the background, experience, and conduct of the accused. *Edwards* v. *Arizona*, 451 U.S. at 482; *Superintendent* v. *Barnes*, 221 Va. 780, 784, 273 S.E.2d 558, 561 (1981).

In stark contrast to the facts of *Estelle* v. *Smith*, Tuggle and his counsel requested the psychiatric examination. More importantly, before Tuggle was interviewed, Dr. Centor fully advised Tuggle of his constitutional rights, and Tuggle signed a "legal rights advice form"[11] indicating that his rights were explained to him, he understood that he had the right to have his lawyer present during questioning, and he voluntarily waived these rights. Furthermore, Tuggle's experience with the criminal justice system was graphically demonstrated when the defendant terminated fur-

---

[11] The legal rights advice form reads as follows:

FORENSIC UNIT        Date November 22, 1983
CENTRAL STATE HOSPITAL
LEGAL RIGHTS ADVICE FORM

With regard to your Rights concerning the interview being the basis of testimony at a sentencing hearing following a conviction of capital murder:

1. Do you understand that you have the right to remain silent?
   yes L.D.T. [Answer and initials in Tuggle's handwriting]

2. Do you understand that any statement you make may be used as evidence against you in a court of law?
   yes L.D.T. [Answer and initials in Tuggle's handwriting]

3. Do you understand that you have a right to talk to a lawyer and to have the lawyer present during all questioning, if you so desire?
   yes L.D.T. [Answer and initials in Tuggle's handwriting]

4. Do you understand that if you cannot afford to hire a lawyer, a lawyer will be appointed to represent you and be present during all questioning, if you so desire?
   yes L.D.T. [Answer and initials in Tuggle's handwriting]

5. The above rights have been fully explained to me, and I sign this paper with complete understanding of them. I further state that I waive these rights and desire to make a statement.
   yes L.D.T. [Answer and initials in Tuggle's handwriting]

6. This statement is completely free and voluntary on my part without any threat or promise from anyone.
   yes L.D.T. [Answer and initials in Tuggle's handwriting]

ther questioning by his remark to the police officer: "*From past experience*, I would like to talk to an attorney." (Emphasis added.)

It is apparent from all the facts and circumstances of the case that Tuggle waived his right to counsel and did so voluntarily, knowingly, and intelligently. Thus, the trial court properly admitted Dr. Centor's testimony regarding Tuggle's future dangerousness.

## B. *Jury Instructions.*

The defendant requested Jury Instruction S-D which defined "depravity of mind" and "aggravated battery." Tuggle has assigned error to the court's refusal of this instruction. Using language contained in *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979), the instruction would have told the jury that "the words 'depravity of mind' mean a degree of moral turpitude and physical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation," and that "[t]he words 'aggravated battery' mean a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish the act of murder." Tuggle contends that without the guidance of this instruction the jury acted arbitrarily and capriciously, "thus violating [his] constitutional rights under the Eighth and Fourteenth Amendments." Tuggle also claims that this "lack of specificity" prevents us from making a rational review of his sentence under Code § 17-110.1.

We have consistently held that a trial court is not required to define these statutory terms. *See Bunch* v. *Commonwealth*, 225 Va. 423, 447, 304 S.E.2d 271, 285, *cert. denied*, 464 U.S. 977 (1983); *Coppola* v. *Commonwealth* 220 Va. 243, 254, 257 S.E.2d 797, 805 (1979), *cert. denied*, 444 U.S. 1103 (1980); *Clark* v. *Commonwealth*, 220 Va. 201, 211, 257 S.E.2d 784, 790, *cert. de-*

| | |
|---|---|
| Witness /s/ Gladys M. Jordan Ph.D. | /s/ Lem D. Tuggle |
| Witness /s/ Arthur Centor, Ph.D. | Signature of Person Being Advised |
| Date 11/22/83 | of His/Her Rights |
| Time 11:39 am | Date 11/22/83 |
| Forensic Unit; Central State Hospital | Time 11:39 am |
| Exact Location | Forensic Unit; Central State Hospital |
| Petersburg, VA | Exact Location |
| | Petersburg, VA |

*nied*, 444 U.S. 1049 (1979). While these definitions are acceptable, *Smith*, 219 Va. at 478, 248 S.E.2d at 149, we have said they are not necessarily "the best or the only" definitions for these terms. *Clark*, 220 Va. at 211, 257 S.E.2d at 790. We reaffirm our previous holdings in this regard and find that the court did not err in denying this instruction.

Tuggle also claims that the trial court erred in granting Instruction S-1. This instruction set forth the two statutory alternatives (the "dangerousness" and "vileness" predicates) for imposing the death penalty. The court instructed the jury that before it could impose the death penalty based on the "vileness" predicate, it must believe beyond a reasonable doubt "[t]hat his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder."

While acknowledging that the language of the instruction tracks that of the statute, Tuggle, nevertheless, argues that the term "torture" should have been deleted because it was not supported by the evidence. We do not agree. The evidence discloses that Havens was subjected to a violent sexual assault culminating in her death. While still alive, she was severely bruised and brutally bitten on her breast. We believe, therefore, that the instruction was supported by the evidence.

## IV. SENTENCE REVIEW.

Code § 17-110.1(C) mandates that we review the death sentence. In so doing, we must consider and determine whether the death sentence "was imposed under the influence of passion, prejudice or any other arbitrary factor," and whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Tuggle alleges the sentence was the product of prejudicial factors. He cites the jury voir dire, the pretrial publicity, the Commonwealth's Attorney's conduct, and the admission of evidence of the separate crime of robbery. For the reasons previously stated, we reject these contentions. Further, our review of the entire record discloses nothing to suggest that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Tuggle also asserts that the sentence is excessive and disproportionate to the penalty in similar cases. The death penalty shall not be imposed unless the Commonwealth has proved beyond a reasonable doubt (1) "that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society," or (2) "that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." Code § 19.2-264.4(C). *See also* Code § 19.2-264.2.[12]

In the present case, the jury found that both the "dangerousness" and "vileness" predicates had been proved beyond a reasonable doubt. There is ample evidence to support these findings. Regarding future dangerousness, the evidence established that Tuggle previously was convicted of second-degree murder and of escape from jail by force. Moreover, as previously noted, psychological testing indicated that Tuggle "shows a high probability of future dangerousness."

We need not review again the evidence surrounding this heinous crime. Manifestly, it was outrageously vile and involved depravity of mind. Further, the battery to the victim was aggravated and "more culpable than the minimum necessary to accomplish an act of murder." *Smith*, 219 Va. at 478, 248 S.E.2d at 149.

We have affirmed the death penalty when both dangerousness and vileness were found in the following cases: *Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967 (1979); *Mason v. Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919 (1979); *Stamper v. Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980); *Turner v. Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011 (1981); *Linwood Earl Briley v. Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied*, 451 U.S. 1031-32 (1981); *James Dyral Briley v. Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980);

---

[12] Tuggle also contends that Code § 19.2-264.2 is unconstitutional because it is vague and overbroad. We have rejected this claim in other cases and adhere to our previous rulings. *See Stockton*, 227 Va. at 135, 314 S.E.2d at 378; *Evans v. Commonwealth*, 222 Va. 766, 770, 284 S.E.2d 816, 817-18 (1981), *cert. denied*, 455 U.S. 1038 (1982); *James Dyral Briley v. Commonwealth*, 221 Va. 563, 580, 273 S.E.2d 57, 67 (1980).

*Clanton* v. *Commonwealth*, 223 Va. 41, 286 S.E.2d 172 (1982); *Quintana* v. *Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied*, 460 U.S. 1029 (1983), *Coleman* v. *Commonwealth*, 226 Va. 31, 307 S.E.2d 864 (1983), *cert. denied*, 465 U.S. 1109 (1984); *Stockton* v. *Commonwealth*, 227 Va. 124, 314 S.E.2d 371, *cert. denied*, 105 S.Ct. 229-30 (1984); *Clozza* v. *Commonwealth*, 228 Va. 124, 321 S.E.2d 273 (1984).

Additionally, we have accumulated and examined the records of all capital felony cases reviewed by us since the enactment of the present statutes. From this review, we conclude that Tuggle's sentence is not excessive or disproportionate to those imposed in similar cases. Indeed, this case is factually similar to *Smith, Mason, James Dyral Briley* and *Coleman.*

We have considered all the assignments of error and find no reversible error. We also have reviewed the sentence of death and conclude that it was properly imposed. Accordingly, the judgment of the trial court will be affirmed.

*Affirmed.*