# Richmond

JAMES A. SMITH v. COMMONWEALTH OF VIRGINIA.

November 14, 1935.

Present, All the Justices.

The opinion states the case.

*G. E. Pence* and *F. H. Brumback*, for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

The plaintiff in error, James A. Smith, stands convicted of murder in the second degree and has been sentenced to five years' confinement in the penitentiary. His claim here is that the evidence does not support the verdict and that the trial court erred in refusing certain instructions.

On the morning of November 26, 1934, he shot and killed his neighbor, Peter Cook.

About six years ago Smith moved into that community. His home was within two or three hundred yards of Peter Cook's home. Peter Cook's son, Luther, lived with him. Another son, Roy Cook, lived about six or seven hundred yards away and within about the same distance of the Smith home, from all of which it appears that these people were near neighbors. Smith came from Bedford county, while the Cooks had lived where they now are for an indefinite time. Matters went smoothly at first.

In the fall of 1930 or 1931, Smith brought some of his hogs to Peter Cook's place and butchered them there. Roy Cook helped in that work. The yield of lard was greater than had been expected, and Roy Cook, a good neighbor, went to his own home, brought back a lard can and gave it to Smith. On November 12, 1934, he sent Smith a note asking that the can be returned, lent as aforesaid. Smith did bring back a can which Cook said was full of holes and was not his can at all, and so he threw it into Smith's field. Smith threw it back into Roy Cook's yard or garden, who in turn threw it on a pile of old cans and trash which lay in a ditch by the roadside. This performance went on for some time. Roy Cook told Smith when he brought the can over that it was not his can. Smith said that it was, and told Cook with an oath not to throw it into the ditch again, or "some one would lose his life," a threat repeated more than once.

In the meantime some trouble arose over Smith's use of a right of way claimed as his own by Roy Cook, and in the early fall of 1934, there was friction between Peter Cook and Smith over an attempt of Smith to relocate his boundary lines. Smith said that on that occasion Peter Cook cursed and threatened him. In these circumstances Smith adopted the habit of going armed, due as he says to this and to the fact that Peter Cook's reputation as a turbulent citizen was bad. Peter Cook was seventy-six

years old. His left arm had been broken once or twice, was stiff and practically useless. Smith was sixty-five years old, and in bad health, but both of these men seemed to be well and strong enough to do the work of ordinary farm laborers.

On the morning of the homicide Peter Cook and his son, Luther, were hauling fodder to Roy Cook's barn. Smith and his wife started out to shuck corn on their place, and from the Commonwealth's standpoint it is interesting to note that he armed himself before starting to work.

Mrs. Roy Cook had three or four times before the homicide taken this can out of her yard and thrown it, not into Smith's field, but into a roadside ditch by that field. On that morning the can was again in her yard and she again threw it on this trash heap or brush pile. Smith picked it up from where she had put it and threw it back upon her lawn. On this morning Smith called Luther Cook to speak to him about the interest on his bond which Cook held. During the course of that conversation he told Luther Cook that he had nothing against him but that he had no use for his father and none for his brother, Roy, and said "some one will lose their life over this can," and that, "I am going to have my right if it costs a life." This was but a few moments before the shooting.

Luther tells us what then occurred:

"A. Then we came in with the second load of fodder and we were going to take that to his place as it was the last load and in coming down the hill from the barn Leona Cook, Roy's wife, came towards the road with this old can in her hand and pitched it up alongside the road in the ditch where she put the rest of the old cans.

"37Q. Did it make some noise when she pitched it in the ditch?

"A. Yes.

"38Q. Where was Smith when your sister-in-law pitched it in the ditch?

"A. I don't know, when I went to go in the field he had started toward his house.

"39Q. Was his wife with him?

"A. Yes, and me and my father kept coming toward the road toward his home and got past the gate that goes to Roy's house when he looked up and said, why there comes Smith back I wonder what they want, he said we will stop and see and he stopped the sled and walked around the back end of the sled and stood there. Smith then was over half way down through this field and came up to the fence and picked up the can out of the ditch and walked toward the gate and my father said, 'Smith don't go up there,' and Smith pitched it toward Roy's front gate and turned around and come back where we were standing and got within five or six feet when he stopped and he had his hands in his pocket facing me and my father.

"40Q. Who was closest to him?

"A. My father, I was a step or so back. My father said, Mr. Smith get out of the road and get on your own land and stay away from up here, and by that time Smith's wife caught hold of his coat and pulled him down, but he pushed her to a side and he said, I have as good right here as you have you old son of a bitch, and my father reached in his pocket and got out this old nubbin of corn and he threw this nubbin of corn and hit Smith and then he said, you hit me and he drew his hand out of his pocket and shot and I was not over two or three feet away.

"41Q. What did your father say?

"A. Oh Lord he has fixed me and he went to fall back and I stepped up and grabbed him and when I did so Smith shot again and I laid him over on the side of the road and when I stopped over there he shot at me over the left shoulder, and I then laid my father over there in the road and Smith then started away and when I looked around he was crossing the fence and went across the field the way he come."

█ In determining if a judgment is sustained by evi-

dence,we are primarily concerned with the case made by the Commonwealth. There was bad blood between the accused and Peter Cook, and Smith went armed to protect himself against any chance encounter, induced he tells us because Cook's character for turbulence was known to him. He had made repeated threats and had said that some one was likely to lose his life over this lard can, and as we have seen a few moments before the homicide said "some one will lose their life over that can," and "I am going to have my right if it costs a life." He then advanced upon the Cooks and when Peter threw and struck him over the eye with an ear of corn he shot him out of hand three times and killed him. These facts we think are ample to sustain a verdict of murder in the second degree.

■ Objection was made to certain instructions. This is the form it took: "The foregoing instructions Nos. A, B, C, D, E, F, and G were offered by the defendant and refused by the court to which action of the court the defendants excepted."

Under Rule XXII of Rules of Court, error when assigned "shall state with reasonable certainty the ground of such objection." This was not done. *James* v. *Powell*, 154 Va. 96, 152 S. E. 539; *Hardyman* v. *Commonwealth*, 153 Va. 954, 151 S. E. 286; *Pauley* v. *Commonwealth*, 151 Va. 510, 144 S. E. 361; *Lorillard* v. *Clay*, 127 Va. 734, 104 S. E. 384 — all cases in which objection was made to the refusal of instructions.

■■ These objections must be made when the instruction is tendered. *James* v. *Haymes*, 160 Va. 253, 168 S. E. 333. Of course this rule should not be applied where the character of the objection is perfectly patent. *Davis* v. *Commonwealth*, 161 Va. 1037, 171 S. E. 598. No one could possibly be misled should a court refuse to tell the jury that the Commonwealth must prove its case.

■ Here in argument distinction is sought to be drawn between a justifiable and an excusable homicide. A distinction which when applied to the facts of a given case is

sometimes shadowy. One, wantonly and viciously assaulted, may to save his life or to protect himself from serious bodily harm, reasonably apparent, kill his assailant. Homicide in such circumstances is justified.

It is commonly and properly said that one cannot interpose self-defense as an excuse unless he was without fault in provoking the difficulty, but this general rule is subject to an exception equally well recognized.

It is thus stated in Wharton's Criminal Law, volume 1, section 614:

"Self-defense exists when the defendant, though aggressor, retreats, asking for peace. But though the defendant may have thus provoked the conflict, yet if he withdraws from it in good faith, and clearly announces his desire for peace, then if he be pursued his rights of self-defense revive. Of course, there must be a real and bona fide surrender and withdrawal on his part; for if there be not, then he will still continue to be regarded as the aggressor. But if A really and evidently withdraws from the contest, and resorts to a place of security, and B, his antagonist, knowing that he is no longer in danger from A, nevertheless attacks A, then A's rights in self-defense revive" citing, among other cases, *Vaiden* v. *Commonwealth,* 12 Gratt. (53 Va.) 717. In such circumstances homicide may be excused though not justified.

This subject has been satisfactorily discussed by Chief Justice Campbell in the late case of *Dodson* v. *Commonwealth,* 159 Va. 976, 167 S. E. 260, 261, where this statement from Davis' Criminal Law is quoted with approval:

"In these several kinds of *justifiable* homicide, it may be observed, that the slayer is in no kind of fault whatsoever, not even in the minutest degree; and is therefore to be totally acquitted and discharged, with commendation rather than blame. But that is not quite the case in excusable homicide, the very name whereof imports some fault, some error, or omission; so trivial, however, that the common law excuses it from the guilt of felony, and our law from all punishment."

A man justified is excused and more. One may be excused without being justified.

The accused contends that Peter Cook without provocation advanced upon him, struck him on the head with a rock and not an ear of corn, that he was wounded and dazed by the blow and shot to save himself. At that time he was going toward Cook, although he tells us that this was incidental, his purpose being to go to his own field and that in doing so it was necessary for him to take the direction that he did. Of course if this was the whole story, he was not guilty, but it is not. There was feud between these men, so bitter that he went armed, intending of course to avail himself of that protection in case of an encounter. It is also true that this ill feeling grew out of his dealings with this lard can, and conduct not justified but well calculated to bring about trouble. Can it be said that he was "in no fault whatsoever, not even in the minutest degree?"

Among the instructions given for the accused is this, No. 9:

"The court instructs the jury that if they believe from the evidence that James A. Smith, on the 26th day of November, 1934, took an empty lard can from his property and threw the same upon the land of Roy Cook, which land adjoined the land of the said Smith; and if the jury further believe from the evidence that Peter Cook and Lew Cook saw the said Smith throw the empty lard can upon the property of the said Roy Cook, then the conduct of the said Smith was not such as would justify the said Peter Cook and Lew Cook in making a felonious assault upon the said Smith; and if the jury further believe that the said Peter Cook and Lew Cook stopped their team some distance north from said Smith and immediately began to advance upon said Smith and his wife in a violent and threatening manner, and if the jury further believe from the evidence that Smith left the right of way and honestly endeavored to avoid meeting the Cooks and to retreat from them as far as he could do so with safety,

and that he was prevented from retreating further by the Cooks, who then and there made a felonious assault on said Smith, and that Smith honestly believed, upon reasonable grounds, that there was immediate and impending danger of death or great bodily harm and that it was necessary for him to then and there shoot Peter Cook in order to protect himself from such danger, and that he acted without malice and only because he was put as he then believed in such danger and fired the shots that killed the deceased by reason thereof, then Smith was excused in shooting Peter Cook in self-defense, and the verdict of the jury should be not guilty."

As we understand it, Smith's contention is that this instruction was intended to cover the case of excusable homicide, and that he was entitled also to an instruction covering justifiable homicide; upon this theory he tendered Instruction C, which was rejected:

Rejected Instruction C:

"The court instructs the jury that if they believe from the evidence that James A. Smith was assaulted and struck by Peter Cook, in anger, and with such violence as to cause Smith to stagger and with such force as to daze him, and if they further believe from the evidence that Peter Cook immediately previous to said assault had threatened Smith with violence, and that when Smith had recovered from the effects of Peter Cook's blow sufficiently to see the position and threatening attitude of said Peter Cook and Lew Cook respectively, and if they believe from the evidence that there was such threatening attitude, and if they further believe from the evidence that it reasonably appeared to Smith from what he saw that he was in imminent danger of losing his life, or of suffering serious bodily harm at the hands of the said Peter Cook, the court tells the jury that he, Smith, had the right to repel the said Peter Cook with such force as to him then seemed necessary even to the extent of taking his life; and in this connection, the court further tells the jury that a man when assailed is held accountable under the law for the exercise

of such judgment as is warranted by the circumstances as they reasonably appear to him at the same time."

Under that construction which the accused said should be put upon his Instruction No. 9, a jury has found the homicide to be inexcusable, and to do this has found the facts are not as there set out. If this were not true, it would have brought in a verdict of not guilty. An act inexcusable and justifiable is something of an anomaly.

Putting aside the matter of retreat, for there is no evidence of it, the jury is told that if Cook made a felonious assault upon Smith, then Smith was not guilty. The verdict tells us that there was no such assault. In short, Instruction No. 9 substantially sets out Smith's claim.

If this be true there was no occasion to elsewhere restate it. Moreover, Instruction C leaves out all reference to the manner in which Smith dealt with the lard can. As to it there is little conflict of evidence, and out of that can trouble came. Smith to have been justified must have been without fault in the "minutest degree."

In short, it is in substance an instruction which tells the jury to find for the accused if they believe a certain state of facts, but which leaves out other facts relevant to the issue.

The heart of the case is this: The jury did not believe the accused.

For two reasons this assignment is not well taken. There has been a plain violation of Rule XXII, and, if that be forgotten, there is still no error in the court's failure to give Instruction C.

We find no errors in the record. The judgment appealed from should be affirmed, and it is so ordered.

*Affirmed.*

BROWNING, J., dissenting.