COURT OF APPEALS OF VIRGINIA

Present:   Judges Benton, Clements and Beales
Argued at Richmond, Virginia


AARON JOSHUA ROBINSON

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1251-05-2                 JUDGE JEAN HARRISON CLEMENTS
                                                         OCTOBER 24, 2006

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Paul F. Sheridan, Judge Designate

Scott Goodman for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Aaron Joshua Robinson (appellant) was convicted in a jury trial of malicious wounding, in

violation of Code § 18.2-51, and use of a firearm in the commission of malicious wounding, in

violation of Code § 18.2-53.1.  On appeal, he contends the trial court erred in refusing his proffered

jury instruction on self-defense without fault.  Finding no error, we affirm.

As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this

appeal.

I.  BACKGROUND

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the

evidence in the light most favorable to the proponent of the instruction."  Commonwealth v.

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Vaughn, 263 Va. 31, 33, 557 S.E.2d 220, 221 (2002). So viewed, the evidence establishes that, in April 2004, a long-standing feud existed between two groups of students at the University of Virginia. One group consisted mainly of members of the University's football team, and the other group consisted of non-athlete students. Appellant was in the latter group, along with a number of his friends, including Paul Drake, John Drake, and Nathan Lacey.

On the evening of April 28, 2004, a cookout to mark the last day of classes for spring semester was held on campus near Faulkner dormitory. Twenty to thirty football players and ten to twelve of appellant's friends attended the cookout. Attempting to peacefully resolve the feud between the two groups, Elton Brown, one of the captains of the football team, approached Paul Drake and Nathan Lacey and conveyed his desire to cease hostilities between the two groups. Brown, Paul Drake, and Lacey agreed the feud was "nonsense" and that it "shouldn't continue."

Subsequently, Lacey went to get appellant, who lived in an apartment in Faulkner dormitory, so that he could be a part of the resolution. Appellant came outside and spoke briefly with Brown. Brown asked him if he was "cool" with everything. Appellant responded affirmatively but, patting his waist, added, "[I]f you touch me or my [friends], there will be problems." Perceiving appellant's words and gesture as a threat, some of the football players reacted angrily. One of them, Almondo Curry, got on a table and yelled, "We got guns, too." When some of the football players moved toward appellant, Lacey started leading him back to his dormitory, while Brown and some of appellant's friends attempted to calm and hold back the angry football players. The crowd of angry football players followed appellant as he made his way to his apartment in Faulkner dormitory. Shortly thereafter, police arrived on the scene and everyone "scattered."

Later that night, appellant and his friends attended a "last-day-of-class" party at the Sigma Nu fraternity house. Around midnight, while appellant was conversing with someone in the front

- 2 -

hallway, Jamaine Winborne, a football player who had heard about appellant's statement at the cookout, approached appellant and asked him why he had threatened to "shoot[] football players." In response, appellant "rolled his eyes" and "kept on talking" with the other person. Angered by appellant's response, Winborne "grabbed [appellant] by the throat and started choking him." After John Drake was able to separate the two men, Brown pulled Winborne down the hallway away from appellant, and Lacey pushed appellant out the front door of the fraternity house. At that point, police arrived at the fraternity house and the party ended.

After leaving the fraternity house, several football players, including Brown, Marquis Weeks, and Jason Snelling walked to their cars. As they neared the parking lot, they saw appellant coming from the lot toward them. Appellant held one hand behind his back as he approached the group. He appeared angry and was cussing. When appellant neared the football players, he dropped his hand to his side, revealing that he had a gun in his hand. Fearing appellant was looking "for another fight" with Winborne, Winborne's roommate, Weeks, attempted to calm appellant, who "was hyped at the time." Brushing by Weeks, appellant "went straight to" Snelling and asked him: "[W]hat's up now? What's up now?" Realizing Snelling was not Winborne, appellant demanded to know where he could find Winborne. Brown told him he did not know. Seeing Winborne was not in the group of football players, appellant "ran off" in the direction from which he had come. Most of the football players in the group then headed to Faulkner dormitory for an "after party."

Several minutes later, appellant returned to his apartment at Faulkner dormitory. Appellant, who was "visibly upset, nervous," and "agitated," told Noel Mukubwa, one of his roommates, about the incident at the fraternity party. Shortly thereafter, Mukubwa heard "extremely loud beating" on the front door. As the "pounding on the door" continued, Mukubwa heard "a lot of commotion like there were people" outside the door. Mukubwa, who was nervous "because [he] had just been

- 3 -

informed of what had happened at the party," heard the door open and then "slam." Concerned for appellant's safety, Mukubwa went out the door a few seconds later. Stepping outside, Mukubwa observed appellant "immediately in front of [him]" on the landing in front of the apartment. Mukubwa further observed eight to eleven football players on the landing, two other people on the steps leading up to the landing, and approximately twenty other individuals in the courtyard below. Winborne was in front of the other football players on the landing. Seeing Winborne lunging toward appellant "with his hands out," Mukubwa "stepped in front of" appellant to try to stop Winborne's advance. Winborne "was obviously very agitated, very upset." Mukubwa told Winborne and the others "to just go away" and "leave [them] alone."

Screaming, "[Y]ou can't do anything about it," Winborne shoved Mukubwa aside and continued his advance toward appellant. Others on the landing advanced toward appellant as well. As Winborne approached, appellant backed up a few steps and said nothing. When Winborne put his hands on appellant's chest, appellant pulled out a gun. As Winborne turned quickly to run down the steps, appellant fired the gun twice, striking Winborne in the leg.

At trial, appellant requested that the jury be given both a self-defense without fault instruction and a self-defense with fault instruction. The self-defense without fault jury instruction proffered by appellant read as follows:

> The defense argues that the defendant acted in self-defense, which requires that the defendant introduce evidence that tends to prove that the defendant was without fault in provoking or bringing on the difficulty, and that the defendant reasonably feared, under the circumstances as they appeared to him, that he was in danger of serious bodily injury or harm; under such circumstances, the defendant had the right to use such force as was reasonably necessary to protect himself from the threatened harm.
> If you believe that the evidence is sufficient on this point to cause you a reasonable doubt as to whether he is guilty, then you shall find the defendant not guilty.

- 4 -

Finding appellant was not entitled as a matter of law to a jury instruction on self-defense without fault because the evidence did not support such an instruction, the trial judge refused the proffered instruction. The trial judge did give appellant's proffered instruction on self-defense with fault.

The jury subsequently convicted appellant of malicious wounding and use of a firearm in the commission of malicious wounding and fixed his punishment at five years in prison for the malicious wounding conviction and three years in prison for the firearm conviction. After denying appellant's motion to set aside the verdicts, the trial judge sentenced appellant in accordance with the jury's verdict, but suspended execution of the five-year sentence for the malicious wounding conviction upon certain conditions.

This appeal followed.

## II. ANALYSIS

On appeal, appellant challenges the trial court's refusal to give his proffered jury instruction on self-defense without fault. He contends the trial court should have allowed the jury to decide whether or not he was at fault in bringing on the difficulty that culminated in the shooting of Winborne. The evidence, he asserts, provided a factual basis for the jury to find that he was not at fault. Thus, he concludes, the trial court erred in ruling he was not entitled as a matter of law to a jury instruction on self-defense without fault and in refusing his proffered instruction. We disagree.

The legal principles applicable to this appeal are well settled. "A party is entitled to have the jury instructed according to the law favorable to his or her theory of the case if evidence in the record supports it." Foster v. Commonwealth, 13 Va. App. 380, 383, 412 S.E.2d 198, 200 (1991). Indeed, in a criminal proceeding,

> [b]oth the Commonwealth and the defendant are entitled to
> appropriate jury instructions on the law applicable to their version of
> the case. See Banner v. Commonwealth, 204 Va. 640, 645-46, 133
> S.E.2d 305, 309 (1963). When evidence exists in the record to

> support the defendant's theory of defense, the trial judge may not refuse to grant a proper, proffered instruction. See Painter v. Commonwealth, 210 Va. 360, 365, 171 S.E.2d 166, 170-71 (1969); Delacruz v. Commonwealth, 11 Va. App. 335, 338, 398 S.E.2d 103, 105 (1990). . . . "Where evidence tends to sustain both the prosecution's and the defense's theory of the case, the trial judge is required to give requested instructions covering both theories." Diffendal v. Commonwealth, 8 Va. App. 417, 422, 382 S.E.2d 24, 26 (1989).

O'Banion v. Commonwealth, 33 Va. App. 47, 55-56, 531 S.E.2d 599, 603 (2000) (en banc). "However, an instruction is proper only if supported by more than a scintilla of the evidence." Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001). "Thus, it is not error to refuse an instruction when there is no evidence to support it." Id.

To assert the affirmative defense of self-defense without fault, the defendant must be completely free of fault in provoking or bringing about the confrontation that resulted in the killing or wounding. See Smith v. Commonwealth, 165 Va. 776, 785, 182 S.E. 124, 128 (1935) (holding that, to employ the without-fault self-defense, the defendant "must have been without fault in the 'minutest degree'"). "Any form of conduct by the accused from which the fact finder may reasonably infer that the accused contributed to the affray constitutes 'fault.'" Smith v. Commonwealth, 17 Va. App. 68, 71, 435 S.E.2d 414, 416 (1993).

For instance, engaging in or continuing a feud may constitute fault. See Smith, 165 Va. at 782-83, 182 S.E. at 127. In Smith, our Supreme Court held that the defendant, who maintained that his neighbor attacked him with a rock "without provocation" and that he shot the neighbor "to save himself," was not without fault because, having engaged in a bitter feud with the neighbor, the defendant had armed himself "intending of course to avail himself of that protection in case of an encounter" with the neighbor. Id. at 783, 182 S.E. at 127. This "ill feeling," the Court observed, "grew out of" the defendant's participation in the feud, including conduct on his part that was "not justified but well calculated to bring about trouble." Id.

- 6 -

The same can reasonably be said of appellant's conduct in this case. Indeed, viewed in the light most favorable to appellant, the evidence establishes that appellant was not completely free of fault in provoking or bringing about the confrontation outside appellant's apartment that resulted in the shooting of Winborne. That confrontation was the latest episode in the bitter, long-running feud between appellant and a group of football players and constituted the culmination of a continuous series of altercations that day between appellant and those players.

The day's first altercation occurred at the cookout at Faulkner dormitory. There, apparently rejecting an offer of peace from the football players, appellant gestured in a manner suggesting he had a gun and warned the football players that there would "be problems" if they touched him or his friends. The football players responded to appellant's perceived threat by stating they had guns, too, and pursuing him back to his apartment.

In apparent response to appellant's warning at the cookout, Winborne later confronted appellant at the Sigma Nu party. Angered by appellant's dismissive response, Winborne grabbed appellant's neck and choked him. A short time later, appellant armed himself and angrily accosted a group of football players leaving the party. Brandishing his gun, he asked the football players where Winborne was. It was clear to those present, including Winborne's roommate, that appellant sought requital for the earlier attack.

Following that incident, appellant returned to his apartment at Faulkner dormitory. Shortly after appellant's arrival, there was sustained, "extremely loud" knocking on the metal front door and a "commotion" outside the door. In response, appellant, who was armed, opened the door. On the landing, Winborne and several other players confronted him. When Winborne advanced and placed his hands on appellant's chest, appellant drew his gun and shot him.

Appellant's fault in the affray was established when, despite having the opportunity to avoid further involvement in the ongoing dispute by staying inside his apartment, he voluntarily continued

the conflict by arming himself, leaving his apartment, and confronting the football players on the landing outside his apartment. Cognizant of the anger that his perceived threat at the cookout had engendered and having just recently informed a group of Winborne's teammates of his desire to settle the score with Winborne, appellant was clearly aware, in answering the persistent, "extremely loud beating" on the front door, that the people outside his door were not intending to make a friendly social call. In arming himself before leaving the apartment, he plainly intended "to avail himself of that protection in case of an encounter" with Winborne. Id. Under such circumstances, appellant's leaving the apartment constituted conduct that was "not justified but well calculated to bring about trouble" in furtherance of the feud. Id. Accordingly, appellant was not free from fault "in the minutest degree." Id. at 785, 182 S.E. at 128.

Because the evidence in this case fails to support a jury instruction on self-defense without fault, appellant was not entitled to such an in instruction, as a matter of law. Thus, the trial judge properly refused appellant's proffered jury instruction on self-defense without fault.

### III. CONCLUSION

For these reasons, we affirm the judgment of the trial judge and appellant's convictions.

Affirmed.